STATE OF CONNECTICUT *v.* JAMES LASKY
(14873)

O'Connell, Lavery and Heiman, Js.

---

620

Argued October 2—officially released November 26, 1996

*Norman A. Pattis*, with whom, on the brief, was *John R. Williams*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *John H. Malone*, supervisory assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of two counts of risk of injury to a child in violation of General Statutes § 53-21.[1] The defendant was acquitted of sexual

---

[1] General Statutes § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to

assault in the second degree and criminal attempt to commit sexual assault in the second degree in violation of General Statutes §§ 53a-49 (a) (1) and 53a-71 (a) (2). The defendant asserts that the judgment is fatally flawed because the trial court improperly (1) denied his motion for a new trial, which he based on his claim of prosecutorial misconduct during the course of the state's rebuttal argument, and (2) failed to grant a mistrial when the prosecution "attempted blatantly improper impeachment of the defendant in the presence of the jury." We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. J was born on May 5, 1980, and his younger brother, E, was born on January 13, 1983. During the year 1990, the brothers resided in the Stowe Village housing project with their mother, Madeline, and other members of their family.

The defendant worked as a terminal manager for Van Com, Inc., a school bus company. During May or June of 1990, the defendant worked at the Hartford terminal, located at 2909 Main Street, adjacent to the Stowe Village housing project.

The defendant was a coowner of a Delorean sports car, and one day in May or June, 1990, he brought the car to the terminal to wash. While he was drying the vehicle, J and three other boys began to question the defendant about the car. At their request, the defendant took the boys for a short ride.

The next day, J returned to the terminal alone and located the defendant. He told the defendant that he lived in the Stowe Village housing project with his family. J began stopping by the terminal several times a week and occasionally brought his seven year old

impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

brother, E, with him. The defendant paid J a few dollars to do odd jobs around the terminal yard.

Between May and November, 1990, the defendant developed a relationship with the boys' family. He took the whole family out to dinner on occasion. Madeline occasionally stopped at the terminal to talk with the defendant.

In November, 1990, Madeline, her boyfriend Norberto, J, E and two of the boys' sisters, moved from Hartford to Puerto Rico. While there, Madeline spoke with the defendant on the telephone about once a week.

Sometime in January, 1991, Madeline called the defendant and asked if he would be willing to have J live with him temporarily. The defendant, who at that time was living with his mother in East Hartford, agreed to have J come to Connecticut and live with him and his mother. The defendant purchased an airline ticket for J, and J flew from Puerto Rico to Hartford.

The defendant was unable to enroll J in school because he lacked documentation establishing that he was J's legal guardian. The defendant and J flew to Puerto Rico where legal documents were prepared vesting custody of J in the defendant. On their return from Puerto Rico, J was enrolled in the East Hartford school system and lived with the defendant and his mother until June, 1991, when, after school ended, J returned to his family in Puerto Rico.

In September, 1991, the defendant moved into a house in Tolland, Massachusetts, and was joined by J, Madeline, Norberto, E and two of his sisters, all of whom had returned from Puerto Rico. After a short period of time, Madeline and her two daughters moved to Hartford. Madeline asked the defendant if he and Norberto would continue to care for the two boys, and the defendant agreed. Around Christmas, 1991, Norberto moved, leaving the defendant alone with the two boys.

Between January, 1992, and June, 1993, J, E and the defendant continued to reside together but moved to a series of apartments in the Southwick, Massachusetts, area. In June, 1993, the defendant rented a house at 407 Warnertown Road, West Suffield. For a few months, a woman and her son also occupied the house with the defendant and the two boys.

During the winter of 1993–1994, J was thirteen years old and in the seventh grade. During this period, the defendant would enter J's bedroom and fondle his penis. J would awaken from the actions of the defendant and tell him to stop. The defendant would stop, but would return on other nights and repeat the conduct. On one occasion the defendant attempted to insert his finger into J's rectum. J punched the defendant in the face, blackening his eye. J was too embarrassed to tell anyone what had occurred.

During the same time period, the defendant would enter E's bedroom before E fell asleep and would place his hand under E's clothing and fondle his penis. On one occasion the defendant placed E's penis in his mouth. E pushed the defendant away. The defendant told E not to tell anyone what had occurred. E did not tell anyone about what the defendant had done to him until May, 1994, when he moved in with his grandmother at Charter Oak Terrace in Hartford.

On May 18 and 19, 1994, J stayed overnight at a friend's house without telling anyone where he was. In the afternoon of May 19, the defendant located J and immediately transported him to his grandmother's apartment and left him with her. E remained with the defendant.

J told his grandmother that he would not go back to live with the defendant. He also told his grandmother about the sexual acts performed on him by the defendant.

On May 21, 1994, the defendant took E to his grand-mother's apartment to spend the weekend. During that weekend, E told his grandmother that the defendant had committed sexual acts upon him.

Madeline was confined to prison from March to May, 1994. J and E were in contact with her by telephone. On Monday, May 23, 1994, the defendant went to New-town to pick up Madeline upon her release. He then took her to her mother's apartment in Hartford where the two boys were staying. The defendant dropped Madeline off and then went to work. When the defendant returned to Madeline's mother's apartment, Madeline confronted him with the accusations that the boys had made concerning acts of sexual impropriety committed upon them by the defendant. Both boys repeated the claims in the defendant's presence. The defendant denied that he committed any of these acts and called the boys liars. When Madeline's brother arrived and confronted the defendant, the defendant left the premises.

The defendant went to his home, packed some clothes and left. He spent the night in his truck. The next day he visited several banks, withdrew money from his account, took cash advances against his credit cards and flew to Mexico City. A warrant was issued for his arrest on June 16, 1994. The defendant returned to Connecticut on July 7, 1994, and was arrested pursuant to the warrant.

At trial, the defendant testified in his own defense. He asserted that J was a troubled youth who was contin-uously in difficulty at home and at school. His difficul-ties at school resulted in his being suspended. The defendant further testified that J had been involved with the police and that he was a liar and a thief who controlled and abused his brother, E. The defendant also claimed that the black eye incident resulted from

his having discovered that J had stolen money from a cup that he kept on top of his refrigerator. Moreover, he claimed that J had assaulted him on six or seven different occasions.

The defendant also asserted that about one month before the boys made their accusations against him, they had been discussing the Michael Jackson sexual abuse case. He claimed that J thought it was "a pretty neat thing" that this boy near his own age received $20 millon on a sexual abuse claim.

The defendant claimed that Madeline had attempted to extort $10,000 from him. He further testified that things said by Madeline and her brother put him in fear of his personal safety. He felt that he might be unsafe in his own home, thus he spent the night in his truck and the left the next day for Mexico. He claimed to have made contact with legal counsel because he believed he needed counsel as a result of the extortion attempt and the threats on his life. He also testified that as soon as he was made aware of the issuance of the arrest warrants, he returned to Connecticut and surrendered.

I

The defendant first asserts that the trial court improperly denied his motion for a new trial, which he based on his claim of prosecutorial misconduct during the course of the state's rebuttal argument. The defendant posits that even though the trial court gave a curative instruction at the very outset of its instructions to the jury, the defendant was nonetheless irreparably prejudiced by the egregious nature of the state's argument. We are not persuaded.

We first note that the defendant's claim with respect to the rebuttal argument by the state must be divided into two parts, one raising an issue properly preserved, and a second, on which he seeks review under the

rubric of *State* v. *Evans*, 165 Conn. 61, 327 A.2d 576 (1973), and *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). We thus address these claims separately.

## A

We first address the preserved claim. Certain additional facts are necessary to a resolution of this claim. In the course of the rebuttal argument, the prosecutor stated: "You never, you never know who you are going to get involved with. When you turn over a rock, you don't know what's going to come out. You have cases of clergy, priests that take these actions—archbishop, I believe was in the papers of late, but as bad as that is, it is worse to keep it a secret, but you never know. You get somebody like a defendant who is this defendant, who has a good job, and appears on the surface to take care of the boys. When you look at him, keep in your minds the same thing that would be found in some of the priests. They are the same veracity you believe is true. It is not so surprising that a person who has good character . . . does that. You see it every day." The defendant did not interrupt the argument to interpose an objection to the prosecutor's statement.

At the completion of the rebuttal argument and before the jury instructions were given, the court recessed. Before the jury was returned to the courtroom, the defendant began to interpose an objection to the quoted portion of the state's rebuttal. The trial court responded by telling counsel that it intended to instruct the jurors in its charge that they should consciously disregard the state's argument concerning the priests and archbishop.[2]

---

[2] The colloquy among counsel and the court was in pertinent part as follows:

"Mr. Norris [Defense Counsel]: Thank you very much, Your Honor. I did not object during Mr. Malone's—

"The Court: I intend to address those issues with respect to my charge.

"Mr. Norris: Your Honor's reading my mind. Your Honor, I felt that I didn't want to object, but the rule is absolutely clear that you cannot speak to

The jurors were brought back into the courtroom and the trial court proceeded to instruct them with respect to the impropriety of the prosecutor's argu-

matters outside the record or reasonable inferences drawn from the evidence in the case. I certainly did not, I didn't invite those comments, and I want to make that statement for the record, but obviously I can be blamed if I invited something that's improper and I did not invite it, and I think it is seriously prejudicial to the defendant in this case.

"The Court: Okay. Did you want to be heard on this, Mr. Malone?

"Mr. Malone [Assistant State's Attorney]: I think it came in the middle of a conversation, Your Honor.

"The Court: The objection that's being raised is that it was improper for you really—in any ways to link or suggest any linkage of this case to the case involving priests or anybody else, that's really totally improper argument. It is not something that the jury should consider. It is no—this case—the societal values of this case are of no importance or concern to them. They are finders of fact only, and to link this or suggest that there is some linkage between this case because of [the defendant's] demeanor, his employment, his education, to priests or archbishops I consider to be improper, and Mr. Norris raised the issue and I think he's correct, you should not be arguing that to the jury.

"Mr. Malone: The import of my arguments was that it should be dealt with openly and honestly, and if I—I was not intending to—I can see where I don't think your view is unreasonable, but I am saying what I said, Mr. Norris, is what I intended and to the extent that my unintended comments have left Mr. Norris, the defendant, or the court with the wrong impression, I apologize to all and would like to restate what I am intending to do.

"The Court: I understand that, it is not nothing with the impression that's left on Mr. Norris, but it is the impression that's left on the jurors.

"Mr. Malone: It is more to it than that case, I didn't do it to take cheap shots, and it was intended—and I want to make it clear that it is not, it is not the way that I am treated by the court. It is not the way Mr. Norris treated me during this trial, which I think was on the highest level, and to that extent, and it was, please believe me it was unintended, and it's like Mr. Appleton, do you remember the—what's that—if I could just—if you just give me a minute, it is the case with the doctor in West Hartford, who killed his wife, and he gets up there and says that the doctor should be held to a higher standard than other people, and that's—and if the court would permit me, as Judge Corrigan permitted Mr. Appleton, if I could apologize to the jury, I would like to do it personally because I really feel that this is not what I do, and it was not intended, and if the court would permit me, I would ask to do it. If I couldn't, I understand.

"The Court: What I am going to do is I am going to tell the jury that during the course of any final arguments that you made reference to other cases of other types of sexual assaults or sexual abuse cases that gained a lot of

ment.[3] The defendant did not object to the trial court's instructions to the jury that it disregard the improper remarks made during the course of the rebuttal argument, nor did the defendant request that the trial court elaborate on the instruction or give additional instructions to the jury concerning that occurrence.

We first note that our review of the trial court's instruction to the jury regarding the impropriety of the state's argument and the jury's duty to disregard that

notoriety and that you, you brought out theories of sexual abuse and things of that nature, and that that is not evidence, and that was not really proper for you to do that, and I am going to advise them that they should consciously disregard that, that there can be no possible linkage between this case and any other case in the past which will happen in the future.

"Mr. Malone: Would Your Honor indicate in the future that that's not what I intended, to the extent that it does apologize?

"The Court: I will. Is that okay with you, Mr. Norris?

"Mr. Norris: It is, Your Honor, thank you."

[3] Upon the return of the jury to the courtroom, the trial court stated: "Ladies and gentlemen, before I begin to give you my charge on the law in this case, I want to bring something to your attention. During his closing arguments, Mr. Malone made reference to other cases of sexual abuse that have gained considerable notoriety over the past years in terms of members of clergy. He also made reference to certain theories, this he said concerning sexual abuse, and the types of sexual abuse and the mental state of the children and so forth, specifically with respect to any other case or cases involving allegations of sexual abuse. That argument was not proper. That is not something that should be considered by you, should not have been something raised by him, and in his defense, I am sure, he didn't mean to imply that because these other events took place that this also took place. I think he was trying to perhaps indicate that these are matters that seem to be coming to the [fore] in recent years, but it was not proper for him to draw your attention and I am going to instruct you to consciously disregard that. You must not link this case with any case that has ever taken place in the past. You must not link it with anything that may happen in the future. Your job is the trier of fact. You are limited to determining the facts in this case only. It has nothing to do with any other case or any other circumstances or any other people. Only [the defendant] is involved in this case and for you to in any way link this case with other cases or cases which have been given publicity would be wrong. It would be unfair to [the defendant]. It would be unfair to yourselves and the system, so I will instruct you not to do that and to attempt to disregard those remarks which were made during the course of his argument as it relates to any other case."

argument convinces us that the court sufficiently and forcefully directed the jury's attention to its obligation not to consider that argument. See *State* v. *Carter*, 34 Conn. App. 58, 86, 640 A.2d 610 (1994), rev'd on other grounds, 232 Conn. 537, 656 A.2d 657 (1995). Moreover, we presume, absent a fair indication to the contrary, that the jury followed the instruction of the court as to the law. *State* v. *Just*, 185 Conn. 339, 357, 441 A.2d 98 (1981). There is nothing to indicate that the jury failed to follow the instructions of the court and thus the defendant's claim of prejudice is unsupported by the record.

The defendant bears the burden of establishing that the prosecutor's statement was prejudicial in light of the entire proceeding. *State* v. *Carter*, supra, 34 Conn. App. 86–87. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. . . ." (Citations omitted; internal quotation marks omitted.) Id., 87.

The remark of the prosecutor concerning sexual abuses committed by members of the clergy constituted a brief and isolated incident in the course of a rebuttal summation. Our review of the entire transcript, including the arguments of both counsel, and a review of the trial court's extensive instruction to the jury to disregard the improper argument do not reveal a pattern of misconduct repeated throughout the course of the trial, or one that was blatantly egregious. Moreover, "[a] prompt cautionary instruction to the jury regarding improper prosecutorial remarks obviates any possible harm to the defendant. . . ." (Citations omitted; internal quotation marks omitted.) Id., 87. Thus, we conclude that the isolated remark did not impact negatively on the fairness of the trial.

The defendant's reliance on *State* v. *Couture*, 194 Conn. 530, 482 A.2d 300 (1984), cert. denied, 469 U.S.

1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985), is misplaced. Unlike in this case, in *Couture* the arguments of the prosecutor were laced with repeated personal references to the defendant and his codefendant "characterizing them, inter alia, as 'murderous fiends,' 'rats,' 'utterly merciless killers' and 'inhumane, unfeeling and reprehensible creatures.' The defendant's repeated objections to these remarks on the defendant's character were overruled and his requests for curative instructions were denied. At the conclusion of this opening summation, the defendant moved in the alternative for a mistrial or for the court to strike [the prosecutor's] entire summation or those portions which the defendant recited on the record, together with 'the strongest possible instructions to the jury to disregard all such comments.' " Id., 561. The trial court denied the motion but at the conclusion of its charge instructed the jury, " 'not to be inflamed by the passionate nature of [the prosecutor's] argument or by his repeated personal comments on the defendants.' " Id. The court further instructed the jury " 'not to consider any personal observations of his as to the guilt or innocence of the defendants, or as to the credibility of any witness.' " Id.

In *Couture*, the remarks were pervasive and the trial court's belated instruction at the end of the entire charge did little to lessen the personal attack on the character of the defendants. Moreover, the remarks constituted a statement by the state's attorney concerning his personal belief in the guilt of the accused, an action that is precluded. Id., 562.

We conclude that, here, the improper remark was isolated, and any potential prejudice to the defendant was obviated by the prompt and proper curative instructions by the trial court. The trial court did not abuse its discretion and acted properly in denying the defendant's motion for a new trial.

## B

The defendant raises for the first time on appeal a claim that another portion of the prosecutor's rebuttal argument constituted prosecutorial misconduct. In the course of the rebuttal, the prosecutor argued that while some people believe that the large number of child sexual abuse cases recently coming to the fore signifies that the system is failing, he believes that it merely symbolizes a healthy societal closet cleaning.[4] The defendant concedes that this portion of the misconduct claim was not properly preserved and thus seeks review under the doctrine of *State* v. *Evans*, supra, 165 Conn. 61, and *State* v. *Golding*, supra, 213 Conn. 239–40.[5]

[1] The prosecutor's remarks were: "You know, it's said that the true measure of any civilization is how well they treat their old people and how they treat their young people. That is when we know that civilization has progressed. They treat their old people with dignity—with dignity, and their young people with dignity. Now, over the years we have had in this society a lot of instances of sexual assault come into play. There are some that think our system is failing. I am not one of those. I am very optimistic, and the reason I am optimistic is this, is that we have always had this in the closet and secrets in civilization and thought everything was going well. Now at last we are bringing these things out in the open, and talking about them, and dealing with them honestly and openly, and yet finally if the allegations are true, they should be dealt with and if not true, they should be summarily dismissed. No question about it, but I think the fact that we have, the fact that we have all of these disclosures, once you sort them out and look at them, in fact that we have cases like this is a healthy measure of our civilization that we are dealing with the problem openly and firmly; so I am not one of those who say that it is a breakdown, and I am not so pessimistic."

[5] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant to the particular circumstances." *State* v. *Golding*, supra, 213 Conn. 239–40.

We are persuaded that "[c]orrectly identified . . . this unpreserved claim of prosecutorial misconduct is merely masquerading as a constitutional claim and therefore must be summarily dismissed." *State* v. *Peruta*, 24 Conn. App. 598, 608, 591 A.2d 140, cert. denied, 219 Conn. 912, 593 A.2d 137 (1991). "While we do not deny that prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . we have long held that *Evans* review of such a claim is unavailable where the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial. . . . Although certain remarks made by the prosecutor, from hindsight, may be deemed imprudent, such isolated and brief episodes . . . fail to implicate the denial of the defendant's constitutional right to due process." (Citations omitted.) *State* v. *Somerville*, 214 Conn. 378, 393, 572 A.2d 944 (1990).[6]

We conclude that, under the circumstances of this case, the prosecutor's remarks did not rise to the level of egregious misconduct that would implicate the defendant's constitutional right to due process.

II

Finally, the defendant asserts that the trial court acted improperly when it denied the defendant's motion

---

[6] We note these additional factors: "[I]n addressing the jury [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Richardson*, 214 Conn. 752, 760, 574 A.2d 182 (1990). Moreover, in this case, trial counsel for the defendant, "who had been assiduous in his protection of the rights of the defendant throughout the trial, was so unimpressed by the alleged prosecutorial misconduct that he neither objected to the remarks nor asked for a curative instruction [nor did he seek a new trial on the basis of this remark]." *State* v. *Lucci*, 25 Conn. App. 334, 348, 595 A.2d 361, cert. denied, 220 Conn. 913, 597 A.2d 336 (1991).

for a mistrial interposed during the cross-examination of the defendant. We are unpersuaded.

Certain additional facts are necessary for an understanding of the defendant's claim and our resolution of it. During the state's cross-examination of the defendant, the prosecutor asked the defendant whether there had been any prior child sexual assault complaints made against him. The defendant objected to the question and the trial court sustained the objection. Immediately thereafter, the prosecutor asked if the defendant knew a certain individual, R. The defendant objected to this question. Out of the presence of the jury, the defendant moved for a mistrial on the basis of the prosecutor's question, claiming that the prosecutor had attempted blatantly improper impeachment of the defendant in the presence of the jury. The trial court sustained the objection and the prosecutor withdrew the question.[7] The defendant filed a postverdict motion

---

[7] "[Assistant State's Attorney]: Was that your testimony, sir—

"[The Defendant]: I'm sorry.

"Q. —that you wouldn't do anything like that, its not—you wouldn't do anything like that to [J] or [E]?

"A. I did not do what was alleged, sir.

"Q. You don't remember saying you wouldn't do anything like that to them?

"A. I would have to hear the testimony, sir.

"Q. All right. Now you testified that you remember [J] saying something about that Michael Jackson situation. Do you recall that, sir?

"A. Yes, sir, I do.

"Q. And did you have any concerns after he said that, that there may be complaints against you?

"A. No, I didn't at the time, no.

"Q. And you never had any complaints like that against you before?

"[Defense Counsel]: Your Honor, I object, this whole question—

"The Court: The objection to that question is sustained.

"[Assistant State's Attorney]: Do you know an individual by the name of [R], sir?

"[Defense Counsel]: Your Honor, I object for relevance and ask the jury to be excused, and I wish to address the court out of the hearing—

"The Court: All right, we will excuse the jury for a minute. You can stretch your legs.

[Jurors excused from the courtroom.]

for a new trial on the basis of a claim of misconduct on the part of the prosecutor in propounding this series of questions.

We note at the outset that the defendant objected to the state's questions regarding the existence of any prior complaints and the objection was sustained by the trial court. Second, the question relating to the defendant's knowing a particular individual was objected to, and, after argument held at the defendant's request in the absence of the jury, the question was withdrawn and was not repeated in the jury's presence. Moreover, the defendant did not request that the trial court give any form of limiting instruction concerning these unanswered questions.

"[Defense Counsel]: First of all I want to move for a mistrial, and I would move for a mistrial at this time on the basis of the question of the prosecutor which he knows is categorically improper. You cannot ask someone whether you [have] ever been the subject of a complaint. We have laws that are specific with respect to the matters of convictions that can be used to impeach someone, and whether someone is the subject of a complaint is not a proper subject matter for impeachment of a witness. He knows better. This other, this area here that he is going into is not a subject matter for impeachment of this witness.

"The Court: I have no idea what he is going into at this point. Your motion for mistrial is denied as to the—I don't know who this person is that he mentioned. I don't know where that came from, so I am not in a position to be able to make any kind of ruling. What is that all about, [assistant state's attorney]?

"[Assistant State's Attorney]: Your Honor, it has to do with his—two parts of his testimony, one, that he would never do anything like this to [J] and my recollection is that's what he said, and he was—that [J] had made some kind of statements about Michael Jackson, making complaints and getting some money from him, and my question to him was whether it caused any concern that that might happen to him, and the follow-up is that whether he had ever had complaints—

"The Court: I sustained the objection to it, so that's out, so what's Mr. R—I don't know what that is. Who is Mr. R? I don't know where you came, I think that's where the next objection is coming from. I have no idea.

"[Assistant State's Attorney]: I will withdraw the question, Your Honor.

"The Court: Okay, but are we going to get back into that again?

"[Assistant State's Attorney]: No, I won't go any further."

The jury returned to the courtroom.

In the course of its instructions to the jury, the trial court told the jury that the evidence to be considered by it was the sworn testimony of the witnesses and the exhibits placed in evidence. The jury was also instructed that it may not go outside the evidence to find facts nor was it to engage in guesswork, conjecture or suspicion. Furthermore, the trial court specifically instructed the jury that questions and objections by the lawyers were not evidence.

"The decision as to whether to grant a motion for a mistrial . . . is one that requires the trial court to exercise its judicial discretion. . . . Our review of the trial court's exercise of its discretion is limited to questions of whether the court correctly applied the law and could reasonably have concluded as it did. . . . Every reasonable presumption will be given in favor of the trial court's ruling. . . . It is only when an abuse of discretion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Lucci*, 25 Conn. App. 334, 341–42, 595 A.2d 361, cert. denied, 220 Conn. 913, 597 A.2d 336 (1991).

Applying this standard of review to the defendant's claim, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for mistrial. We note that the trial court sustained the objection to the one question to which objection was made and the second question objected to was withdrawn by the prosecutor and was not repeated. We also note that no request was made by the defendant at the time of the occurrence for any form of curative instruction from the trial court. Moreover, the trial court in the course of its charge to the jury, properly instructed the jurors

that they could not go outside of the evidence in the case, that the evidence consisted only of the testimony of witnesses and the exhibits, and that questions were not evidence.

"[T]he burden is on the defendant to establish that, in the context of the proceedings as a whole, the question was so prejudicial that it deprived him of a fair trial." (Internal quotation marks omitted.) *State* v. *Cruz*, 212 Conn. 351, 365, 562 A.2d 1071 (1989). "Even if the questions were improper, as the trial court apparently decided they were, the fact that the questions were asked is not enough to deprive the defendant of a fair trial, particularly where the court gave an appropriate cautionary instruction to the jury." *State* v. *Person*, 20 Conn. App. 115, 132, 564 A.2d 626 (1989), aff'd, 215 Conn. 653, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 776 (1991).

We conclude that the defendant has failed to establish that he was prejudiced by the unanswered questions and also failed to establish that the trial court abused its discretion in denying his motion for a mistrial.

The judgment is affirmed.

In this opinion the other judges concurred.