## STATE OF CONNECTICUT *v.* BOBBY JONES
## (14430)

Dupont, C. J., and Landau and Heiman, Js.

Argued November 4, 1996—officially released February 25, 1997

*J. Brendan Sharkey*, special public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael A. Pepper*, assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of con-

spiracy to commit murder in violation of General Statutes §§ 53a-54a (a)[1] and 53a-48 (a).[2] On appeal, the defendant asserts that the trial court improperly (1) denied his motion for judgment of acquittal based on his claim that the evidence was insufficient, (2) admitted evidence of acts of prior misconduct by the defendant, and (3) denied his motion for mistrial. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On April 27, 1993, at about 9 p.m., Ticey Brown was walking on the sidewalk in front of 75 County Street in New Haven when he was struck by two bullets, one in his head, the other in his chest. As a result of those gunshot wounds, Brown died.

The shots that caused Brown's death were fired from a vacant lot on the side of 75 County Street. They were fired from two different weapons. Immediately before the shooting, the victim was walking along County Street toward Goffe Street with Ephraim Gillard and Sam Hook. Because the shots were fired from the side of 75 County Street and Gillard and Hook were walking behind the victim, neither could see who had fired the shots.

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

About fifteen minutes before the shooting, Antonio West, while walking through a parking lot at 200 Goffe Street, observed Bobby Jones, Willie Harris and Darryl McIntyre sitting in a burgundy Ford Mustang. West had seen Jones driving the automobile on prior occasions. The parking lot at 200 Goffe Street was situated so as to permit a person to walk through an alleyway alongside 75 County Street to County Street itself.

West saw the three men get out of the vehicle. He observed that Jones was taller than the other two men. Jones was dressed all in black, Harris was wearing blue jeans and a hooded sweatshirt, and McIntyre was wearing black jeans and a black army coat. West saw Jones and McIntyre don black masks. The men exited the parking lot, crossed the street and walked in the direction of 75 County Street. Harris spoke to West as they passed each other. West went into the building at 58 Orchard Street and the other three men continued in the direction of 75 County Street.

A few minutes before Brown was shot, Simone Blake, while walking from her home on Shelton Avenue, passed by 75 County Street. She saw three young black men standing in the alleyway along the side of 75 County Street. She observed that one of the young men was taller than the other two and that they were all wearing dark clothing. She saw Brown walking toward her after she had passed the alleyway and they exchanged pleasantries as they passed each other. Blake continued to walk until she heard gunshots coming from the area where she had observed the three young men. She saw Brown fall to the ground and went to his assistance. She did not see anyone run from the alleyway to County Street nor had she seen anyone else in the alley other than the three young men.

Latisha Lewis lives on the second floor at 610 Orchard Street and a window in her apartment overlooks the

rear of 75 County Street. At about 9 p.m. on April 27, 1993, Lewis was looking out her window when she saw three men in the area of 75 County Street. All three men were wearing dark clothing. One of the men was taller than the other two. Lewis saw the three men run down the path to the rear of 75 County Street and at that point she heard gunshots and saw gunfire coming from the hands of two of the three men. The firing stopped and the taller man and one of the other men ran toward Goffe Street and the third man ran directly under Lewis' window toward Orchard Street.

Priscilla Harris heard gunshots, looked out of her window and observed two individuals running toward Goffe Street and another person running toward Orchard Street. She identified Willie Harris as the person whom she had seen running toward Orchard Street.

On June 16, 1993, warrants were issued for the arrests of Jones, Harris and McIntyre. The police were not able to locate Jones or Harris. On June 22, 1993, the New Haven police executed a search and seizure warrant that permitted them to search a red Ford Mustang registered to Mae Jones. The police found and took into possession a sweatshirt and mask.

On November 9, 1993, the police, while searching a residence pursuant to a warrant, discovered Jones hiding under a bed in a darkened room. The police took the defendant into custody pursuant to the arrest warrant.

I

The defendant first asserts that the trial court improperly denied his motion for judgment of acquittal based on his claim that the evidence was insufficient to support a verdict of guilty to a charge of conspiracy to commit murder. He posits that the evidence was insufficient to support proof of (1) the existence of an agreement, (2) the commission of an overt act in fur-

therance of the conspiracy, and (3) intent. He further claims that his conviction of the crime of conspiracy was premised on the improper use of inferences and the defendant's mere presence near the scene of the crime. We are unpersuaded.

"When reviewing sufficiency of the evidence claims, we impose a two part analysis. First, we construe the evidence in the light most favorable to sustaining the verdict. . . . Second, we determine whether, from that evidence and all the reasonable inferences which it yields, a [trier of fact] could reasonably have concluded that the defendant was guilty beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 32 Conn. App. 193, 200–201, 628 A.2d 996, cert. denied, 227 Conn. 920, 632 A.2d 698 (1993). Even in the most serious of criminal cases, the identification of the perpetrator may be proved by circumstantial rather than direct evidence. See id., 201.

"The jury's sole province as the trier of fact is to draw all reasonable and logical inferences from the facts as it finds them to exist. . . . The jury also has the sole and absolute responsibility to weigh conflicting evidence and to determine the credibility of the witnesses. . . . The issue of the identification of the accused as the perpetrator of the crime is peculiarly one of fact to be resolved by the jury. . . . 'If evidence, whether direct or circumstantial, should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction.'" (Citations omitted.) Id., 201–202.

"To establish the crime of conspiracy under § 53a-48 of the General Statutes, it must be shown that an

agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Further, the prosecution must show both that the conspirators intended to agree and that they intended to commit the elements of the underlying offense." (Citations omitted; internal quotation marks omitted.) *State* v. *Lewis*, 220 Conn. 602, 606–607, 600 A.2d 1330 (1991). Thus, in order to sustain its burden, the state was obligated to prove beyond a reasonable doubt that (1) the defendant, McIntyre and Harris agreed to cause the death of another person, (2) at the time that they entered into the agreement, they intended that the death be caused, and (3) that one of the conspirators committed an overt act in furtherance of the conspiracy.

"The gravamen of the crime of conspiracy is the unlawful combination and an act done in pursuance thereof, not the accomplishment of the objective of the conspiracy. . . . Conspiracy is an inchoate offense the essence of which is an agreement to commit an unlawful act. . . . The prohibition of conspiracy is directed not at the unlawful object, but at the process of agreeing to pursue that object. . . . Conspiracy is an anticipatorial offense distinguished by a corrupt agreement by two or more persons to commit a specific objective crime." (Internal quotation marks omitted.) *State* v. *Haggood*, 36 Conn. App. 753, 764–65, 653 A.2d 216, cert. denied, 233 Conn. 904, 657 A.2d 644 (1995).

"The state is not obligated to prove the existence of a formal agreement among the parties, but must prove that the parties engaged knowingly in a plan to commit a forbidden act. . . . As a consequence, circumstantial evidence may be used to provide the proof necessary to establish the existence of the agreement because

conspiracies, by their very nature, are formed in secret and only rarely can be proved by other than circumstantial evidence." (Citations omitted; internal quotation marks omitted.) Id., 765.

Our review of the evidence convinces us that on the basis of the direct and circumstantial evidence before it, the jury could have reasonably found the existence of an agreement among the defendant and his coconspirators to work together for the unlawful purpose of committing a murder, that one of the conspirators committed an overt act, and that the defendant intended that conduct constituting the crime of murder be performed.

The jury could have reasonably found that the three conspirators arrived in the general area where the murder took place about fifteen minutes before the murder occurred. They traveled to the scene of the crime together in an automobile operated and ordinarily used by the defendant. The automobile was parked about one block from the scene of the murder.

The defendant, when speaking with the police during the investigation of the homicide, denied that he was near the area where the murder took place. He asserted that he, Harris and McIntyre were together at a basketball court at Chapel and James Streets at about 9 p.m. on the night of the murder. Moreover, when Harris was interviewed by the police as to his whereabouts on the night of the murder, he asserted that he was at the basketball court together with the defendant and McIntyre.

Witnesses, however, positively identified all three alleged conspirators and placed all three of them together in the area of the murder at about the time the shooting took place. The color and type of clothing worn by the defendant and his two coconspirators was described by West as he observed them about fifteen

minutes before the murder. Further, three men matching the description of the defendant and his two coconspirators were observed walking through back lots in the direction of 75 County Street. At the time of the murder, two men wearing black clothing and a third wearing a green sweatshirt were observed standing in a lot at the back of 75 County Street and two of the men fired weapons in the direction of 75 County Street. Thus, the jury could have reasonably found from the evidence before it that the three men observed in the rear of 75 County Street were the defendant, Harris and McIntyre and that two of them shot the victim in the head and chest.

Shortly after the shooting, Tanisha Bundy and Sean Bradley identified the defendant's Ford Mustang as having been parked in a parking lot off Goffe Street, in the general area of the shooting. Further, Priscilla Harris testified that immediately after the murder, she saw two individuals run in the direction of Goffe Street and a third individual run toward Orchard Street. She identified the third individual as Willie Harris.

The state also produced evidence that, if believed by the jury, supported a claim that the defendant, Harris and McIntyre had been involved together on a daily basis in selling cocaine in the area of Dickerman, Orchard and Goffe Streets. Jeffrey Covington testified that the defendant supplied him daily with drugs for resale. He established that he would obtain drugs by calling the defendant on his pager. On the night Brown was murdered, Covington attempted to contact the defendant on his pager. The defendant did not respond. Covington attempted to contact the defendant for three days after the murder without success. Covington never saw the defendant or Harris again after the night Brown was killed.

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence

presented to the jury was sufficient to have permitted it to find the defendant guilty of the crime of conspiracy. Thus, we reject the defendant's claim that the evidence was insufficient to support a verdict of guilty of the crime of conspiracy.

## II

The defendant next asserts that the trial court improperly admitted into evidence testimony concerning prior acts of criminal misconduct by the defendant and his coconspirators. The state claimed that the testimony was admissible as highly probative evidence of the existence of a relationship among the three individuals. The defendant asserted that it was not relevant or material to any of the exceptions under which such evidence is deemed admissible, and, if it met the test of relevance, the probative value of such evidence was outweighed by its prejudicial effect. We disagree.

This claim was fully addressed and rejected by this court in the companion case, *State* v. *Harris*, 43 Conn. App. 830, 832–37, 687 A.2d 544 (1996). That decision is dispositive of this claim.

## III

Finally, the defendant claims that the trial court improperly denied his motion for a mistrial that was predicated on the jury's exposure to a weapon that the state could not link to this prosecution. We are unpersuaded.

Certain additional facts are necessary to an understanding of our resolution of this claim. At trial, the state called Detective Christopher Grice of the New Haven police department, who testified that he arrived at the scene of the Brown shooting, secured the area, took photographs and engaged in a search for evidence. He also testified that he took into his possession and control certain items that he discovered at the scene.

Some of those items were admitted into evidence as exhibits.

In the course of his testimony, Grice was handed a yellow envelope that had been marked as a state's exhibit for identification and was asked if he recognized its contents. In the presence of the jury, the witness took a gun out of the envelope to read the serial number. The witness indicated that he did recognize the item contained in the envelope. Grice was then asked whether he had taken "some action relative to that item." The defendant's counsel objected and requested that the jury be excused.

In the absence of the jury, the court asked counsel where the weapon had come from and the state's attorney responded that the .44 caliber handgun had been found on County Street a few days after the shooting. The state's attorney further explained that one of the bullets taken from the victim's body was determined to be from a .44 caliber handgun. The police, however, had been unable to link the gun positively to the case.[3] The state then argued that the defendant could not be surprised by the presence of the gun because the defendant knew of the gun's existence and had requested that the gun be made available for examination by his ballistics expert. The defendant then moved for a mistrial[4] on the ground that the display of the

---

[3] The state's attorney explained that the gun had been "found on County Street, behind someone's house a few days after the shooting. The police took custody of it, they brought it down, they didn't know if it had anything to do with this particular crime. One of the bullets that was taken from Mr. Brown's body was determined to be a .44. This is a .44 caliber handgun. What they tried to do was tried to link this gun up with any other evidence in the case. They were not able to make a comparison that was positive. They couldn't rule it out, they couldn't rule it in."

[4] "[Defense Counsel]: The only other remedy is to ask for mistrial, and I suppose for the record I should ask for one.

"The Court: [Addressing counsel for the codefendant Harris] Do you want one?

"[The Defendant Harris' Attorney]: No.

gun itself was "incredibly prejudicial."[5] The trial court denied the motion.[6]

When the jury returned to the courtroom, the state, without objection, was permitted to place Grice's testimony before the jury that the handgun was not found on April 27, 1993, but was found on County Street by another detective on April 30, 1993. Further, Grice testified that the handgun and certain ammunition were processed for the existence of latent fingerprints and that no identifiable prints were found. The trial court then instructed the jury that the gun was not an exhibit, there was no evidence linking the gun with the murder, and, at that point, the gun had nothing to do with the case before the jury.[7]

During the remainder of the trial, neither the state nor the defendant, nor the codefendant Harris made any reference to the handgun. It was never admitted as a full exhibit, nor was it ever connected to the murder of Brown or to either the defendant or the codefendant.

In the course of its charge to the jury, the trial court, without specifically referring to the handgun, charged

"The Court: Your motion is denied. I do not think with a suitable instruction to the jury there is any prejudice to the defendant which would warrant a mistrial."

[5] At the conclusion of the state's explanation, defense counsel stated: "It's not a surprise. The point is that when that gun is properly identified—my intention was to object to it because there's no connection. Now to bring in an I.D. officer who ran fingerprints and have him pull it out of a paper bag I think is incredibly prejudicial."

[6] See footnote 4.

[7] In giving the curative instruction concerning the display of the handgun, the trial court stated: "Ladies and gentlemen, I want to remind you that the weapon which you saw, and probably should have stayed in the envelope, but it came out, you saw it was a gun that has not been marked as a full exhibit in this case, there is no evidence connecting it to this case in any way whatsoever, and you're to frankly disregard that it was a gun unless and until there is further evidence about it, which may or may not happen. But as far as you're concerned, that gun, exhibit thirty-one for identification, at this point in time has got nothing to do with this case."

the jury that it was to disregard any evidence that was stricken or any evidence that was offered and refused.[8] The defendant did not take any exceptions to the trial court's charge.

"The decision as to whether to grant a motion for a mistrial . . . is one that requires the trial court to exercise its judicial discretion. . . . Our review of the trial court's exercise of its discretion is limited to questions of whether the court correctly applied the law and could reasonably have concluded as it did. . . . Every reasonable presumption will be given in favor of the trial court's ruling. . . . It is only when an abuse of discretion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion." (Internal quotation marks omitted.) *State* v. *Lasky*, 43 Conn. App. 619, 635, 685 A.2d 336 (1996).

Applying this standard of review to the defendant's claim, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for mistrial. We note that the trial court took swift and proper curative action to dissipate completely any potential prejudice to the defendant by the display of the handgun. The curative instruction was given by the court, sua sponte, and made clear to the jury that the handgun had, at that point in time, no connection with the case against the defendant and could not be considered by the jury as evidence in the case. Moreover, the trial court properly included in its charge to the jury the admonition that it was not to consider any evidence that it had been directed to disregard or that had not

---

[8] The trial court specifically charged on this issue as follows: "Frequently you would hear a bit of testimony and I would order it stricken and you would be told to disregard it. You are to consider only the evidence which was admitted and if some evidence was stricken and then you were told to disregard it, or some evidence was offered and refused, you are not to consider it. You must erase it from you minds. . . ."

been admitted as a full exhibit. "In the absence of a clear indication to the contrary, juries are presumed to follow the instructions that they are given." *State* v. *Guess*, 39 Conn. App. 224, 235, 665 A.2d 126, cert. denied, 235 Conn. 924, 666 A.2d 1187 (1995).

The burden rests on the defendant to establish that, in the context of the proceedings as a whole, the action of which he complains was so prejudicial as to deprive him of a fair trial. See *State* v. *Lasky*, supra, 43 Conn. App. 636. Here, the trial court determined that the handgun was improperly taken out of the envelope, but the trial court took decisive action by promptly delivering a curative instruction to the jury. We have not had the opportunity that the trial court had to observe the circumstances in which the gun was exposed, the length of time that the jury had an opportunity to observe the gun, or whether the jury even saw the gun. We conclude that the trial court did not abuse its discretion when it determined that the display of a handgun to the jury was not sufficiently prejudicial to the defendant as to require a mistrial, especially when the display was followed by a clear and concise cautionary instruction to the jury. See id; *State* v. *Person*, 20 Conn. App. 115, 132, 564 A.2d 626 (1989), aff'd, 215 Conn. 653, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 776 (1991).

The judgment is affirmed.

In this opinion the other judges concurred.