## STATE OF CONNECTICUT *v.* GREGORY JOHNSON
## (AC 20635)

Schaller, Spear and Hennessy, Js.

Argued March 19—officially released September 4, 2001

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Edward R. Narus*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Gregory Johnson, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a,[1] felony murder in violation of General Statutes § 53a-54c[2] and robbery in the first degree in violation of General Statutes § 53a-134 (a) (2).[3] The defendant claims that (1) the trial court improperly admitted evidence of uncharged misconduct and failed to give a limiting

---

[1] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a . . . firearm. . . ."

[2] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[3] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

instruction as to that evidence, (2) the prosecutor made improper comments during his closing argument that violated the defendant's rights to a fair trial and against self-incrimination, and (3) the guilty verdict on the charges of robbery in the first degree and manslaughter in the first degree with a firearm is legally inconsistent. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 4, 1996, the Hartford police were called to 39 Ogilby Drive to investigate a shooting. At the scene, the officers found the victim, later identified as Ansley Gayle, barely breathing with a gunshot wound to his chest. Medical personnel transported the victim to Saint Francis Hospital and Medical Center, where he was later pronounced dead.

Lisa Champagnie was with the victim when he was shot. The victim lived with Champagnie's best friend, Thania Edwards. Champagnie lived with her cousin, Audrey Duckworth. Duckworth was the girlfriend of the defendant, who also lived in the apartment at that time.

Champagnie had a cellular telephone account that served two cellular telephones. Champagnie gave Edwards one telephone with the understanding that Edwards would reimburse her for charges that she incurred. Edwards incurred $741.52 in charges and had not reimbursed Champagnie.

Champagnie learned that Edwards was traveling to Jamaica on vacation and decided to hold personal property of Edwards until she paid the telephone bill. On or about July 1, 1996, the defendant drove Champagnie to Edwards' apartment, occupied at the time only by the victim. Champagnie told the victim that she had Edwards' permission to take Edwards' duffle bag and suitcase, which permission she in fact did not have, and took the luggage that already had been packed for the vacation. When Edwards returned, she confronted

Champagnie, and the two agreed that the luggage would be returned in exchange for partial payment of the bill.

On July 4, 1996, the victim telephoned Champagnie and informed her that he would bring the payment with him when he visited the defendant. Champagnie met the victim outside her apartment, and the victim paid her $183. Champagnie then went inside the apartment, returned with the defendant, and the three left together in Edwards' vehicle to retrieve the luggage. In the vehicle, the defendant warned the victim that he had a gun. Both the defendant and the victim were carrying handguns at the time.

The three arrived at the apartment of Champagnie's cousin at 43 Ogilby Drive, where Champagnie had stored the luggage. The victim retrieved the bags while the defendant and Champagnie waited. After the bags were placed in the trunk of the vehicle, an argument ensued between the victim and the defendant regarding money owed. It was later disclosed that the debt arose from a marijuana purchase by the victim. The victim replied that he did not have the money at that time. The defendant then grabbed at the victim's right pocket, and the victim grabbed the defendant by the collar. The defendant demanded the money again, then pulled the handgun from his waistband and shot the victim in the chest. The defendant then searched the victim and took money that he found in the victim's pocket.

Another witness to the shooting, Marshalene Chin, ran into her apartment at 39 Ogilby Drive and told her mother, Pamela Channer, what had transpired. Channer dialed 911 for the police and an ambulance. Chin did not know the defendant at the time of the shooting, but later identified him from a photographic array.

After the shooting, the defendant left the scene in a vehicle driven by Courtney Smith. Duckworth was a passenger in the vehicle. The defendant ordered Cham-

pagnie at gunpoint to get into Smith's vehicle. The four drove to the apartment of Verona Burnett at 211 Nahum Drive, where they stayed for several hours. The defendant there told Burnett that he had argued with the victim and had shot him.

The next day, the defendant contacted his cousin in New York City and asked for transportation and a place to stay. The defendant, Duckworth and Champagnie were driven to the home of the defendant's sister in Brooklyn, New York. The defendant held Champagnie there for two weeks, without her consent, claiming that if she left, he would kill her and members of her family.

Duckworth returned to Hartford and relayed information about the criminal investigation to the defendant in New York. The defendant contacted Chin, asking what she knew of the killing and the details on police actions in the investigation. The defendant also had Champagnie call an attorney in Hartford to inform the attorney that a friend of the victim, and not the defendant, had shot the victim. The defendant sent Champagnie to Hartford for the purpose of introducing this misinformation to the police, warning her that if she told the truth, either he or his friends would kill her.

An arrest warrant was issued for the defendant on July 19, 1996. The defendant successfully remained at large until he attempted to enter Canada at Toronto International Airport on June 27, 1997, where he was apprehended and returned by Canadian authorities.

At trial, the defendant's theory of defense was that his arrest was the result of a mistaken identity and that Champagnie and Chin had falsely implicated him. The defendant did not testify. No evidence was adduced concerning any person for whom the defendant was mistaken.

The jury returned a verdict of not guilty on the murder count but guilty of the lesser included offense of man-

slaughter in the first degree with a firearm in violation of § 53a-55a (a), felony murder and robbery in the first degree. The court sentenced the defendant to a total effective sentence of fifty-five years imprisonment.

## I

The defendant claims first that the court improperly admitted evidence of uncharged misconduct and failed to give a limiting instruction as to that evidence. Specifically, the defendant claims that it was improper to allow Champagnie to testify that the defendant killed the victim as a result of a drug related debt. We are not persuaded.

The following additional facts are relevant to our disposition of this claim. Outside the presence of the jury, the defendant sought to preclude Champagnie's testimony that the dispute arose out of an unpaid, drug related debt. Defense counsel stated: " I would object to that coming in because I don't think it has—I think the prejudicial effect is—outweighs any probative value that it has." Defense counsel further argued that "[t]he fact of what the money was owed for, I don't see how that has any bearing on this case or why." The state responded that "it's not being offered for the truth but that's what the defendant said and it gives the jury information as to why there may be a debt owed, what money was owed for what reason." The court concluded that "[t]he jury has a right to know what they were arguing about," and allowed the testimony.

## A

"The standard of review is clear. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion

is manifest or where an injustice appears to have been done. . . .

"Evidence of a defendant's prior misconduct is not ordinarily admissible to prove his bad character or criminal tendencies. . . . Evidence of other misconduct, however, may be allowed for the purpose of proving many different things, such as intent, identity, malice, motive or a system of criminal activity . . . or an element of the crime. . . . Such evidence, however, to be admissible must also be relevant and material." (Citations omitted; internal quotation marks omitted.) *State v. Clark*, 62 Conn. App. 182, 186–87, 774 A.2d 183, cert. granted on other grounds, 256 Conn. 905, 772 A.2d 597 (2001).

The court properly concluded that the testimony regarding the argument between the victim and the defendant was relevant. Our Supreme Court "previously [has] held that evidence of a victim's mental state may be relevant to establish the defendant's motive to kill the victim. See, e.g., *State v. Hull*, 210 Conn. 481, 501–502, 556 A.2d 154 (1989) ([t]he victim's mental state was relevant both to show the victim's fear of the defendant . . . and to establish the defendant's motive for committing the crime [citations omitted]) . . . ." (Citation omitted; internal quotation marks omitted.) *State v. Wargo*, 255 Conn. 113, 138, 763 A.2d 1 (2000). Furthermore, the evidence was material because it helped establish an element of the crime; see *State v. Green*, 62 Conn. App. 217, 240–41, 774 A.2d 157, cert. granted on other grounds, 256 Conn. 927, 928, 776 A.2d 1147, 1148 (2001); specifically, the requisite mental state for robbery. See *State v. Brown*, 199 Conn. 47, 54–58, 505 A.2d 1225 (1986) (evidence of uncharged misconduct of defendant relevant to show nature of relationship with another party involved with defendant in commission of robbery); *State v. Ruffin*, 48 Conn. App. 504, 506–508, 710 A.2d 1381 (uncharged misconduct evi-

dence of drug dealing activity of rival gangs relevant to motive for shooting), cert. denied, 245 Conn. 910, 718 A.2d 18 (1998); *State* v. *Jones*, 44 Conn. App. 338, 346, 689 A.2d 517 (evidence of drug dealing permitted to show relationship among alleged coconspirators where defendant charged with conspiracy to commit murder), cert. denied, 240 Conn. 929, 693 A.2d 301 (1997); *State* v. *Smith*, 42 Conn. App. 41, 49–52, 680 A.2d 1340 (1996) (testimony as to drug dealing relevant to motive in manslaughter, conspiracy to commit murder charges). We conclude that the evidence of the nature of the dispute was both relevant and material to the charge of robbery and thus proceed to our analysis of whether the evidence was more prejudicial than probative.

The court, when balancing the probative value of the evidence against its prejudicial effect, considers the effect on the jury of admitting the evidence. See *State* v. *Ortiz*, 40 Conn. App. 374, 380, 671 A.2d 389, cert. denied, 236 Conn. 916, 673 A.2d 1144 (1996). In *Ortiz*, "the court admitted the challenged testimony after finding that the evidence, although prejudicial to the defendant, was necessary to allow the jury to get the 'whole flavor of this case' and to avoid having it look at the circumstances surrounding the death of the victim 'in a semivacuum.' " Id. Because *Ortiz* involved drugs and drug dealing, notwithstanding the fact that the defendant was charged with murder, this court concluded that "[i]t is unlikely that the evidence of the defendant's prior involvement with drugs could have shocked or influenced the jury to the extent that the defendant was deprived of a fair trial . . . [and] reject[ed] the defendant's claim that the trial court abused its discretion in admitting the challenged evidence." (Citation omitted.) Id. We conclude, as we did in *Ortiz*, that the nature of the argument between the defendant and the victim here was necessary to place the events in context and,

therefore, the court did not abuse its discretion in admitting the testimony.

## B

The defendant further claims that even if we were to conclude that the evidence was properly admitted, the court improperly failed to provide a limiting instruction. We disagree.

As a preliminary matter, we note that the defendant neither requested a limiting instruction with respect to the testimony, nor excepted to the court's failure to give such an instruction sua sponte. Our Supreme Court has stated that "[a]bsent a request, the court cannot be required to determine whether or not to give a limiting instruction when, as here, for tactical purposes the defendant might very well have not desired one." *State* v. *Johnson*, 188 Conn. 515, 522, 467 A.2d 1237 (1982).

Furthermore, the defendant presents no exceptional basis for review of this unpreserved claim. Under similar circumstances, we declined the invitation to review such a claim as plain error, concluding that "plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . The failure by the trial court to give, sua sponte, an instruction that the defendant did not request, that is not of constitutional dimension and that is not mandated by statute or rule of practice is not such an obvious error that it will affect the fairness and integrity of and public confidence in the judicial proceedings." (Citation omitted; internal quotation marks omitted.) *State* v. *Eason*, 47 Conn. App. 117, 120, 703 A.2d 130 (1997), cert. denied, 243 Conn. 962, 705 A.2d 552 (1998).

We conclude, given the nature of a single drug transaction in relation to the charges of robbery and murder,

that the outcome here should be no different from the one in *Eason*. The failure of the court sua sponte to give a limiting instruction was not improper.

## II

The defendant next argues that the prosecutor made improper comments during his closing argument that violated the defendant's rights to a fair trial and against self-incrimination. Specifically, the defendant claims that the prosecutor's closing remarks violated his rights under the fifth, sixth and fourteenth amendments to the United States constitution because the prosecutor vouched for state's witnesses, appealed to the emotions of the jurors, commented on the defendant's failure to testify, shifted the burden of proof to the defendant to prove his innocence and implied that a defense witness' testimony should be discounted because he was accompanied by an attorney. We conclude that these claims are without merit.

The following facts are relevant to our disposition of this issue. During rebuttal closing argument, the prosecutor's summation included a recap of the witnesses presented and the testimony offered.[4] The prosecutor's

[4] The defendant claims that the following portion of the state's closing argument violated his constitutional rights: "Some of you even, maybe, when you got down here and found out it's a murder case, like, wow, coming for jury duty and suddenly it's murder. I hit a home run; I get the most important case of all to do. You may have some apprehension about doing it. Obviously you didn't, because we selected you. But think about that. People can be afraid of what may happen to them. Fear of being a witness, fear of coming forward, giving information, coming in and testifying, what might happen if they do do those things, what can happen to them, you know? Again, let's talk about the real world here, right? Is this something that we can relate and understand? And you heard some of that. You heard Lisa Champagnie tell you, 'I was afraid of this man.' Does that make any sense considering what she told you? I'm standing there; the guy gets in a beef about some money and shoots a guy dead. He tells me and threatens me, well, maybe I ought to pay attention to that, right? I got the best example in the world, I was there; I saw it happen. It's not hearsay; it's not relying on somebody else, not puffing. Again, you heard Marsha Chin—I asked her, Are you nervous to be here? She didn't say she was nervous, she said she was

rebuttal largely addressed issues raised in the closing argument of the defendant. The court's charge to the jury pointed out that the closing arguments were not

frightened. I'm like, why are you frightened? I'm frightened because of what may happen when I testify in this case. Right out of her mouth. Consider that when you evaluate her testimony, right? Think about that. You can relate to that. You can appreciate the circumstances that they're in. And again, I told her—she didn't want to be here, I had to subpoena her, I had to bring her in. She didn't come voluntarily and say here, I'm glad to be here. Consider that. And even Winsom Burnett, she told you, too. She hadn't talked to the police before. She was afraid to go to the police with the information she had. The defendant said he shot this guy, right? She came in. She testified. She told you that. She's nervous and she's afraid of being here testifying. And I think, again, you can relate to it. Look at your position as a juror. You're the juror and it's important. Look at the people who got to come in and put their neck on the line and say this is what I saw, okay? And again, I think you can understand it and appreciate that."

\* \* \*

"The question is: Is the evidence that you have sufficient to find the defendant guilty. The defendant wants you to look at the missing pieces. I'm asking you to look at the pieces of the puzzle that exist and see if you can see the picture in front of you. That's what we're talking about. And again, evaluate the defense claim, you know? Is what he says reasonable? Does he have pieces for that picture of the puzzle? What puzzle is he picturing for you and do the pieces fit? All of the pieces, all you know. Like I said, you can take any piece, turn it sideways, backward, forward and look at it different ways and try to harmonize them, see how they fit, are they supported by common sense and experience.

\* \* \*

"They found the card: Gregory Johnson. He lives here. The defendant says well, you know, he has no reason to stay there and stuff. Well, you don't know that. You don't know why that is. He can't support that. There's no pieces as to why he left. . . . I'm giving you some evidence. I'm saying he's involved in a homicide and he took off. I'm giving you those pieces. He hasn't given you those pieces. He's asking you to conjecture on that sense.

\* \* \*

"What's he going to Canada for? You have any evidence why? Go visit relatives? Take a long appointed vacation? You don't have those pieces, but you can look at the other pieces you do have. He was leaving the country. Maybe he thought that up there they're not going to have access to what Connecticut records are, United States records. Maybe that was the purpose. I don't know. I can't tell you, but you know that, too.

\* \* \*

"And Courtney Simms. Well, he contradicts things, so that what [the] defense claims, well, that's important because he did that. Well, consider a

evidence and were not to be considered as such.[5] The defendant raised no objection to the closing argument and now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[6] the plain error doctrine[7] and this court's supervisory powers.[8]

couple things. He gave a statement to the police, to us, with his lawyer present. He testified with his lawyer present, too. Did you see any other witnesses do that? Consider that when you evaluate his testimony. . . .

"Again, Lisa Channer got arrested. She gave a statement. Did she call an attorney when she was read her rights and such and say I want my attorney, I want to talk to him before I give you a statement? No. She said I'll talk to you, tell you everything that I can tell you. Wrote it down. So again, why is [Simms] maybe not being truthful?"

[5] The court's charge to the jury was in relevant part as follows: "And in the same way, what either counsel may have said to you in their respective summations as to the facts or the evidence in the case, should have weight with you only to the extent that their recollections agree with yours.

\* \* \*

"Matters that are not evidence include . . . the arguments and statements of the lawyers. The lawyers are not witnesses. What they have said in their closing arguments is intended to help you interpret the evidence, but it is not evidence. And as I indicated earlier, if the facts as you remember them differ from the way the lawyers have stated them, then it is your memory that controls."

[6] In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[7] "The plain error doctrine of Practice Book § 60-5 requires a defendant to demonstrate that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . . [W]e consistently have stated that review under the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Citation omitted; internal quotation marks omitted.) *State* v. *Murphy*, 254 Conn. 561, 572, 757 A.2d 1125 (2000).

[8] Practice Book § 60-2 provides in relevant part: "The supervision and control of the proceedings on appeal shall be in the court having appellate jurisdiction . . . . The court may, on its own motion or upon motion of any party, modify or vacate any order made by the trial court, or a judge

"Because the defendant did not raise the allegations of prosecutorial misconduct at trial, he can obtain review on appeal only under *State* v. *Golding*, [supra, 213 Conn. 239–40], or the plain error doctrine. Practice Book § 60-5.[9] When the verdict in a criminal case is challenged on the basis of allegedly prejudicial remarks made by the prosecutor, the defendant bears the burden of proving such prejudice within the context of the trial as a whole. . . . It is well established that [w]e will not afford *Golding* review to [unpreserved] claims of prosecutorial misconduct where the record does not disclose a pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Dwyer*, 59 Conn. App. 207, 211–12, 757 A.2d 597, cert. denied, 254 Conn. 937, 761 A.2d 763 (2000). "[I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Richardson*, 214 Conn. 752, 760, 574 A.2d 182 (1990).

We cannot conclude, having reviewed the excerpts of the state's closing argument offered by the defendant, that the defendant has carried his burden in establishing

thereof, in relation to the prosecution of the appeal. . . ." "Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Tate*, 59 Conn. App. 282, 289, 755 A.2d 984, cert. denied, 254 Conn. 935, 761 A.2d 757 (2000).

[9] Practice Book § 60-5 provides in relevant part: "The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

any violation that would satisfy the requirements of *Golding* or plain error review, or would compel this court to resort to its supervisory authority. The state's rebuttal argument suggests bases for finding the testimony of various witnesses credible. "[T]he state's attorney did not vouch for the credibility of the witnesses. He merely addressed the witnesses' qualifications and the inferences the jury could draw therefrom." *State* v. *Jeudis*, 62 Conn. App. 787, 794, 772 A.2d 715, cert. denied, 256 Conn. 923, 774 A.2d 140 (2001).

We also conclude that the defendant's claim that the prosecutor's remarks shifted the burden of proof to the defendant to establish innocence and commented on the defendant's failure to testify are without merit. There is nothing in the record to support those assertions. The portions of the closing argument to which the defendant alludes constitute an attack on the defendant's theory of misidentification, not improper comment as to the defendant's refusal to testify. "The remarks of the state's attorney, therefore, represented reasonable comments on weaknesses in the defendant's case, including his failure to contradict the state's evidence and to support his theory of defense and, accordingly, were not comments on the defendant's failure to testify." *State* v. *Perry*, 58 Conn. App. 65, 71, 751 A.2d 843, cert. denied, 254 Conn. 914, 759 A.2d 508 (2000).

As this court has stated, "even if we were to consider, as the defendant suggests, the prosecutor's remark along with the defendant's other unpreserved claims of inappropriate comments by the prosecutor, we cannot say that in the context of the entire trial . . . that the defendant met her burden of proving that the argument deprived her of a fair trial. The fact that all of the defendant's claims focus on allegedly prejudicial remarks made only during closing argument demonstrates that such comments were not a pervasive quality of the entire proceeding." (Citation omitted.) *State* v.

*Rivera*, 61 Conn. App. 763, 774, 765 A.2d 1240, cert. denied, 256 Conn. 901, 772 A.2d 599 (2001).

"It is well settled . . . that a defendant may not prevail under *Golding* or the plain error doctrine unless the prosecutorial impropriety was so pervasive or egregious as to constitute an infringement of the defendant's right to a fair trial, nor will we invoke our supervisory authority to reverse an otherwise lawful criminal conviction absent a showing that the conduct of the prosecutor was so offensive to the judicial process that a new trial is necessary to deter such misconduct in the future." (Internal quotation marks omitted.) *State* v. *Lacks*, 58 Conn. App. 412, 422–23, 755 A.2d 254, cert. denied, 254 Conn. 919, 759 A.2d 1026 (2000). We conclude that the prosecutor's remarks, if offensive at all, were not so pervasive as to deny the defendant a fair trial and, thus, the defendant's claims as to the state's closing argument are without merit.

### III

The defendant's final claim is that the guilty verdict on the charges of robbery in the first degree and manslaughter in the first degree with a firearm is legally inconsistent. Specifically, he argues that because the mental states required for robbery and manslaughter are mutually exclusive, the defendant may not be convicted of both when the conviction flows from the same act. We are not persuaded.

The defendant seeks review of his unpreserved claim under *State* v. *Golding*, supra, 213 Conn. 239–40. "When reviewing a claim that a verdict is inconsistent . . . we look carefully to determine whether the existence of the essential elements for one offense negates the existence of the essential elements for another offense of which the defendant also stands convicted. If that is the case, the verdicts are legally inconsistent and cannot withstand challenge. . . . Put more simply, we deter-

mine if there is a rational theory by which the jury could have found the defendant guilty of both crimes. . . .

"It is not inconsistent . . . to find that a criminal defendant possesses two different mental states, as long as [the] different mental states relate to different results. *State* v. *Flynn*, 14 Conn. App. 10, 27, 539 A.2d 1005, cert denied, 488 U.S. 891, 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988). In *Flynn*, the defendant was convicted of, inter alia, assault on a police officer, which requires intentional conduct, and reckless endangerment, which requires reckless conduct. . . . The convictions resulted from an incident where the defendant, in a crowded bar, threw a beer bottle at several police officers. . . . On appeal, the defendant claimed that the verdict was inconsistent, as he could not have acted intentionally and recklessly with regard to the same factual circumstances. . . . This court concluded that the verdict was not inconsistent because the mental states went to different results. Accordingly, the jury could have found that, by throwing the bottle at the police officers, the defendant acted intentionally with the conscious objective to prevent the officers from performing their duty, while at the same time, he acted recklessly with respect to the other patrons in the bar." (Citations omitted; internal quotation marks omitted.) *State* v. *Morascini*, 62 Conn. App. 758, 761–62, 772 A.2d 703, cert. denied, 256 Conn. 921, 774 A.2d 141 (2001).

In *State* v. *Hawthorne*, 61 Conn. App. 551, 554–55, 764 A.2d 1278 (2001), the defendant claimed that a conviction of attempt to commit murder and assault in the first degree constituted an inconsistent verdict because the former charge required intentional conduct, whereas the latter charge required reckless conduct. We rejected that claim because the jury reasonably could have found that the defendant's attack on the victim consisted of separate criminal acts as to the same victim, and each act supported one charge. Id.

As in *Hawthorne*, the defendant's conduct here involved two separate acts. In the first act, the defendant intentionally used a firearm to obtain money from the victim by force. The defendant, using the same weapon, then engaged in conduct, specifically, the robbery, that created a grave risk of death to the victim and thereby caused the victim's death after the robbery was completed. The robbery was completed without the victim's death. The fact that the defendant remained at the scene with the weapon and then became involved in the altercation substantiates the manslaughter charge. The two acts pertained to different results and, thus, were mutually exclusive. See *State* v. *Morascini*, supra, 62 Conn. App. 762. The defendant therefore cannot establish a clear violation of his constitutional rights under *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.