# STATE OF CONNECTICUT *v.* NELSON COLON
## (AC 22339)

Lavery, C. J., and Mihalakos and Flynn, Js.

Argued March 27—officially released July 2, 2002

*Alice Osedach-Powers*, assistant public defender, for the appellant (defendant).

*Melissa L. Streeto*, special deputy assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Kevin J. Murphy*, assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Nelson Colon, appeals from the judgment of conviction, rendered after a jury trial, of criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 1995) § 53a-217c[1] and murder in violation of General Statutes § 53a-

---

[1] General Statutes (Rev. to 1995) § 53a-217c (a) provides in relevant part: "A person is guilty of criminal possession of a pistol or revolver when he possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony . . . ."

54a.[2] On appeal, the defendant claims that the trial court improperly (1) denied his motion for a mistrial following improper comments made by the prosecutor during closing argument, (2) instructed the jury regarding the element of intent, (3) admitted into evidence a videotape of the crime scene and (4) denied his motion to suppress out-of-court identifications of him made by several witnesses on the basis of a single photograph. In addition, the defendant argues that there was insufficient evidence to prove intent, an essential element of the crime of murder. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 2, 1996, Paul Tirado resided at 1 Malikowski Circle, New Britain. Noel Soto was temporarily living with Tirado during the previous months, and Amy Finn also occasionally stayed at the apartment. In addition, Marcos Jimenez lived at 23 Malikowski Circle and the defendant, Nelson Colon, resided with Luz Gonzalez at 65 Malikowski Circle. All of these people knew one another and were present at Tirado's home on August 2, 1996. Over the course of the day, Tirado, Soto, Finn, Jimenez and the defendant smoked "ready rock"[3] and drank alcohol in the apartment.

At approximately 4 p.m., the defendant drove Soto to his mother's home to retrieve either his keys or his wallet. At that time, the defendant was intoxicated and had trouble operating the vehicle. The two returned to Tirado's home, but the defendant left after about one

---

[2] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . .

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person. . . ."

[3] "Ready rock" is a form of crack cocaine that is ingested by inhaling it through a pipe.

hour. At approximately 7 p.m., the defendant returned to Tirado's house with Jimenez. Jimenez brought with him a supply of "ready rock" that he shared with the group. Shortly thereafter, the defendant and Tirado argued, and the defendant angrily left the apartment.

About fifteen minutes after the defendant departed, the victim, Ramon Rivera, arrived. Soto was the only person in the apartment who previously had known Rivera. Rivera planned to stay for the night and took a shower shortly after he arrived.

In the meantime, the defendant drove home after leaving the apartment. He walked into his home, walked upstairs and left right away. The defendant returned to Tirado's home and entered the apartment without knocking on the door, causing a ruckus. As Rivera was walking out of the bathroom, he told the defendant to "lower your voice and respect the man's house." The defendant responded, "I don't like you." After stating, "[A]s a matter of fact, I really don't like you," the defendant began shooting at Rivera. Soto witnessed a struggle between the defendant and Rivera, and watched as Jimenez attempted to intervene. Soto escaped through the kitchen door.

While this was happening, Tirado and Finn were in the bedroom. They heard the gunshots and Finn looked to see what was happening. She saw the defendant shooting. Both Tirado and Finn escaped through the bedroom window and hid behind a dumpster across the street. As they waited, they saw the defendant exit the apartment with an object in his hand that resembled a handgun and Jimenez trailed behind. The defendant sped off in his vehicle and Jimenez walked toward his home at 23 Malikowski Circle.

After the defendant left, Soto reentered the apartment and called 911. When the New Britain police arrived shortly after 9 p.m., Soto, Tirado, Finn and Jimenez

were all at the apartment waiting and cooperated with the police. The four friends voluntarily went to the police station and provided statements regarding the shooting. They each said that "Nelson" shot the victim, although none knew his last name, and they gave a detailed description of the defendant and his vehicle. Soto informed the police as to where the defendant was living at the time. In addition, Tirado, Finn, Soto and Jimenez each voluntarily submitted to an atomic absorption test,[4] and each tested negative for gunpowder residue. After he left the police station, Jimenez could not be located to testify at trial.

Later that evening, the defendant's vehicle was located in Hartford. The vehicle was impounded and searched. New Britain police found what appeared to be blood on the steering wheel and the trunk. The defendant, however, was not in the area. Later testing of the blood found on the trunk of the defendant's vehicle revealed traces of DNA consistent with the victim's DNA.

On January 23, 1997, the defendant was found at a bus station in Philadelphia and taken into custody. The defendant was charged with criminal possession of a pistol and murder. On April 24, 2000, the jury returned a guilty verdict on both counts, and the defendant received a total effective sentence of sixty-five years incarceration. This appeal followed. Additional facts will be set forth where necessary to our disposition of the issues on appeal.

I

The defendant first claims that he was deprived of his right against self-incrimination as guaranteed by the fifth amendment to the United States constitution. This claim stems from remarks made by the prosecutor dur-

---

[4] The atomic absorption test is designed to detect gunpowder residue.

ing his rebuttal closing argument, which the defendant views as comments on his failure to testify. Furthermore, the defendant claims that the court's curative instructions were insufficient to remedy the harm. We disagree.

The defendant claims that the following portion of the state's closing argument violated his constitutional rights: *"Do you remember—I don't remember hearing a reason why Nelson Colon fled to Philadelphia. What did he say?* Fled to Philadelphia—drugs, drugs, drugs. That's what you're supposed to do is ignore all the evidence in this case and just remember the people were using drugs, and then it's easy, isn't it?

\* \* \*

"Nelson Colon was not on the scene. Nelson Colon was the only person who was not on the scene when the police arrived. The judge will tell you that it's up [to] you to decide. But when someone flees the scene of a crime, that can be strong evidence that they knew they were guilty and that's why they left.

"And you have to decide, *is there any evidence at all which indicates any other reason for Nelson Colon leaving?"* (Emphasis added.)

"[T]he Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (Internal quotation marks omitted.) *State* v. *Burton,* 258 Conn. 153, 172, 778 A.2d 955 (2001), quoting *Griffin* v. *California,* 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965); see also General Statutes § 54-84.[5] "An indirect remark by the prosecuting attorney

---

[5] General Statutes § 54-84 provides: "(a) Any person on trial for crime shall be a competent witness, and at his or her option may testify or refuse to testify upon such trial. The neglect or refusal of an accused party to testify shall not be commented upon by the court or prosecuting official,

which draws the jury's attention to the fact that the accused failed to testify may also violate the accused's right." *State* v. *DeMartino*, 7 Conn. App. 292, 294, 508 A.2d 809 (1986). The state, however, is not "prohibited from calling to the jury's attention any portion of the evidence that stands uncontradicted . . . . Only when a prosecutor's comment focuses the attention of the jury on the failure of the defendant to testify does it become objectionable. . . . The ultimate test of whether a prosecution argument indirectly and impermissibly comments on the defendant's failure to testify is whether, because of its language and context, the jury would naturally and necessarily interpret it as comment on the defendant's failure to testify." (Citations omitted; internal quotation marks omitted.) *State* v. *Downing*, 68 Conn. App. 388, 398, 791 A.2d 649, cert. denied, 260 Conn. 920, 797 A.2d 518 (2002).

In the present case, the defendant did not testify. His theory of defense was one of misidentification, namely, that it was Jimenez who shot the victim and not the defendant. During his summation, defense counsel argued that Jimenez was the shooter and pointed to his absence at trial. The defendant, however, presented no evidence explaining why he immediately fled the crime scene to Hartford and later to Philadelphia. While it is true that Jimenez subsequently left Connecticut shortly after the incident, he remained at the crime scene and cooperated with the police. The prosecutor's remarks during rebuttal closing argument were merely an attack on the defendant's theory of defense and not improper comment regarding the defendant's failure to testify. See *State* v. *Johnson*, 65 Conn. App. 470, 483, 783 A.2d

except as provided in subsection (b) of this section.

"(b) Unless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. In cases tried to the court, no unfavorable inferences shall be drawn by the court from the accused's silence."

1057 (remarks of state's attorney on weaknesses in defendant's case, including defendant's failure to contradict state's evidence and to support theory of defense, did not constitute comments on defendant's failure to testify), cert. denied, 258 Conn. 930, 783 A.2d 1031 (2001). Therefore, we cannot conclude that the prosecutor's remarks were such that the jury could naturally and necessarily have taken them as comments on the defendant's failure to testify.

In addition, the court specifically instructed the jury that it could not draw any negative inference from the defendant's failure to testify and, further, that the defendant did not have the burden to produce any evidence or prove his innocence.[6] "In the absence of contrary evidence, jurors are presumed to have followed the instructions given to them by the trial judge." *State* v. *Jones*, 65 Conn. App. 649, 655, 783 A.2d 511 (2001). Therefore, even if we were to conclude that the prosecutor improperly commented regarding the defendant's failure to testify, any harm that may have resulted was addressed by the court's instructions. We also note that the defendant initially agreed that curative instructions

[6] The court's instruction to the jury provided in relevant part: "The defendant's right to testify: The defendant did not testify in this case. An accused person is under no obligations to testify in his own behalf. He has a constitutional right not to testify. You must draw no unfavorable inferences from the defendant's failure to testify.

* * *

"Consciousness of guilt: In any criminal trial it is permissible for the state to show that conduct of the defendant after the time of the alleged offense may fairly have been influenced by the criminal act. That is, the conduct shows a consciousness of guilt.

"The conduct of a person in leaving the scene of a crime, if proven that he was in fact at the scene of a crime, may be considered in determining his guilt since if unexplained, it tends to prove a consciousness of guilt. This does not mean, however, that the defendant has any burden to produce any evidence or to prove his innocence.

"Moreover, flight, if shown, is not conclusive. Nor does it raise a legal presumption of guilt. Rather, it is to be given the weight to which you, the jury, think it is entitled under the circumstances shown."

would be sufficient to address the prosecutor's comments.[7]

On the basis of the foregoing, we cannot conclude that the jury would naturally and necessarily interpret the prosecutor's remarks as comments on the defendant's failure to testify. Thus, the prosecutor did not impinge on the defendant's right against self-incrimination.[8]

## II

The defendant's next claim is that the court improperly instructed the jury on the essential element of intent by reading the entire statutory definition contained in General Statutes § 53a-3 (11).[9] Specifically, the defendant argues that the court's reading of the entire statutory definition of intent, including the portion that provides that a person acts intentionally when his con-

[7] The following colloquy took place:

"[Defense Counsel]: . . . And there was a comment earlier in the rebuttal, and I do not have it verbatim. It was something to the effect that defense or Mr. Colon hasn't explained why he fled to Hartford.

"And my concern with that is that it implies that we had an obligation to so explain. And it could be interpreted as a potential comment on the defendant's failure to testify. . . .

"The Court: All right. What is your proposed correction, if any?

"[Defense Counsel]: Well, I would ask the court in the charge to—I think it can be handled in the charge to say if there's any concern that the defendant should've provided an explanation for why he fled to Hartford, he's under no obligation, again, to provide [an] explanation."

[8] We note our awareness of *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), which only recently was decided by our Supreme Court. In *Singh*, the court reiterated the factors that a reviewing court must weigh in determining whether "prosecutorial misconduct was so serious as to amount to a denial of due process . . . ." (Internal quotation marks omitted.) Id., 700. Because we conclude that the prosecutor did not engage in misconduct in the first instance, we need not evaluate the *Singh* factors to determine if the defendant was denied due process.

[9] General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

scious objective is "to engage in such conduct," confused and misled the jury. He claims that the court's instructions improperly permitted the jury to return a verdict of guilty to the charged crime of murder without finding that the defendant possessed the specific intent to cause the victim's death. We disagree.

The defendant concedes that he did not properly preserve his claim for appeal by taking exception to the charge as given. He seeks review under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[10] We will review the defendant's claim pursuant to *Golding* because the record is adequate and an improper instruction on an element of an offense is of constitutional magnitude. See *State* v. *Austin*, 244 Conn. 226, 235, 710 A.2d 732 (1998).

"When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a

---

[10] Under *State* v. *Golding*, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) "In the absence of any one of these conditions, the defendant's claim will fail." Id., 240.

constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Citation omitted; internal quotation marks omitted.) *State* v. *Rodriguez*, 63 Conn. App. 529, 534, 777 A.2d 704, cert. denied, 256 Conn. 936, 776 A.2d 1151 (2001).

In the present case, the court first instructed the jury regarding the elements of murder.[11] Thereafter, the court explained that intent "relates to the condition of mind of the person who commits the act, his purpose in doing it. As defined by our Penal Code, a person acts 'intentionally' with respect to a result or to conduct when his conscious objective is to cause such result *or to engage in such conduct.*" (Emphasis added.) In addition, the court referred the jury to this definition of intent four times. The court, however, repeatedly instructed the jury that the defendant must have possessed the "specific intent to cause death." "Although [w]e agree with the defendant that that portion of § 53a-3 (11) dealing with intent to engage in proscribed conduct is irrelevant to a murder prosecution pursuant to § 53a-54a . . . we conclude that the charge read as a whole did not mislead the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Maia*, 48 Conn. App. 677, 686–87, 712 A.2d 956, cert. denied, 245 Conn. 918, 717 A.2d 236 (1998).

Viewing the instruction in its entirety, we conclude that it was not reasonably possible that the jury was misled by the extraneous intent to engage in conduct language of the statute. The court repeatedly instructed

---

[11] The court instructed the jury in relevant part: "For you to find the defendant guilty of murder, the state must prove the following elements beyond a reasonable doubt: One, that the defendant intended to cause the death of another person; and two, that in accordance with that intent, the defendant caused the death of that person or of a third person.

"In order to convict the defendant of murder, you must first find that the defendant caused the death of Ramon Rivera. You must find proven beyond a reasonable doubt that Ramon Rivera died as a result of the actions of the defendant."

the jury that to find the defendant guilty of murder, it first had to find that the defendant intended to cause the death of another person. Therefore, the defendant cannot prevail under the third prong of *Golding* because he has failed to establish that a constitutional violation clearly exists and that it clearly deprived him of a fair trial.

### III

The defendant argues next that the court improperly admitted into evidence a videotape of the crime scene. Specifically, he claims that the videotape was cumulative evidence and the probative value did not outweigh its prejudicial effect. The state argues to the contrary and argues further that any error resulting from the admission of the videotape was harmless. We agree with the state that the admission of the videotape, if improper, was harmless.

"It is well established that a trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Lewis*, 67 Conn. App. 643, 650, 789 A.2d 519 (2002).

We need not reach the issue of whether the videotape was admissible, however, because even if we assume without deciding that the court abused its discretion in admitting the videotape into evidence, its admission of the videotape constituted harmless error. See *State* v. *Shabazz*, 246 Conn. 746, 758–59, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999). "[T]o establish the harmfulness of a trial court ruling, the defendant must show that it is more

probable than not that the improper action affected the result. . . . The question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the result?" (Citation omitted; internal quotation marks omitted.) *State* v. *Russo*, 62 Conn. App. 129, 137, 773 A.2d 965 (2001).

In addition, the defendant bears the burden to prove that an improper evidentiary ruling was harmful. See *State* v. *Lewis*, supra, 67 Conn. App. 653. "One factor to be considered in determining whether an improper ruling on evidence is a harmless error is whether the testimony was cumulative . . . ." (Internal quotation marks omitted.) *State* v. *Rolli*, 53 Conn. App. 269, 276, 729 A.2d 245, cert. denied, 249 Conn. 926, 733 A.2d 850 (1999).

In the present case, a series of still photographs depicting the crime scene was admitted into evidence. Each photograph, including those of the victim, was admitted through and explained by a New Britain police officer. In addition, a videotape of the crime scene containing substantially similar representations was admitted into evidence. A New Britain police officer narrated as the videotape was published to the jury.

The defendant argues that because the videotape shows the victim lying on the floor in pools of blood, its probative value was outweighed by the prejudicial effect. The jury, however, had before it sufficient evidence, other than the videotape, with which it could find the defendant guilty of murder beyond a reasonable doubt. There were four eyewitnesses who testified that the defendant was the shooter. Each of those witnesses submitted to atomic absorption testing and tested negative for gunpowder residue. In addition, the defendant's stepdaughter[12] testified that about fifteen minutes

---

[12] It is unclear from the record whether the defendant was actually married to the girl's mother or merely residing with her.

before she heard gunshots, the defendant returned home, walked upstairs to retrieve something and immediately left the home. Furthermore, DNA consistent with the victim's DNA was found on the trunk of the defendant's vehicle.

We conclude that the admission of the videotape, even if improper, was harmless because it was cumulative and not likely to affect the result of the trial.

## IV

The defendant next argues that the court improperly denied his motion to suppress certain out-of-court identifications of him made by several witnesses to the crime. Specifically, he argues that because the witnesses were shown only a single photograph to identify him, the procedure was unnecessarily suggestive. Furthermore, he claims that under the totality of the circumstances, the identifications were also unreliable. We agree that generally an identification procedure whereby a witness is shown a single photograph is unnecessarily suggestive. We conclude, however, that the identifications in this case were nevertheless reliable.

Our review of a court's denial of a motion to suppress a pretrial identification is well settled. "[T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Salmon*, 66 Conn. App. 131, 135–36, 783 A.2d 1193 (2001), cert. denied, 259 Conn. 908, 789 A.2d 997 (2002).

"An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood

of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable." (Internal quotation marks omitted.) *State* v. *Sanchez*, 69 Conn. App. 576, 580–81, 795 A.2d 597 (2002). "Absent exigent circumstances that require police officers promptly [to establish] either the defendant's complicity or his innocence . . . the showing of a single photograph of a defendant is almost always unnecessarily and impermissibly suggestive." (Citation omitted; internal quotation marks omitted.) *State* v. *Findlay*, 198 Conn. 328, 338, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986).

Each of the witnesses was presented with a single photograph of the defendant. The state argues that although using a single photograph to identify a defendant is per se suggestive, there were exigent circumstances in this case. We are not persuaded. This is not a situation where the witnesses did not know the shooter and may readily forget the description of who had committed the crime. See *State* v. *Watson*, 50 Conn. App. 591, 603–604, 718 A.2d 497 (proper for police to provide victim with opportunity to identify assailant while memory still fresh and necessary to allow police to eliminate quickly innocent parties with minimum delay), cert. denied, 247 Conn. 939, 723 A.2d 319 (1998), cert. denied, 526 U.S. 1058, 119 S. Ct. 1373, 143 L. Ed. 2d 532 (1999), cert. dismissed, 255 Conn. 953, 772 A.2d 153 (2001). Therefore, the likelihood that the witnesses would forget or that the police would apprehend the wrong person was slim. Because the witnesses were presented with a single photograph to identify the defendant and no exigent circumstances existed, the procedure was unnecessarily suggestive.

Our inquiry does not, however, stop here. We must now determine whether the suggestive identification

procedure was nonetheless reliable. "The reliability of an identification procedure is considered under various factors, such as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." (Internal quotation marks omitted.) *State* v. *Davis*, 61 Conn. App. 621, 631, 767 A.2d 137, cert. denied, 255 Conn. 951, 770 A.2d 31 (2001).

"[W]e examine the legal question of reliability with exceptionally close scrutiny and defer less than we normally do to the related fact finding of the trial court. . . . Absent a very substantial likelihood of irreparable misidentification, [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Internal quotation marks omitted.) *State* v. *Cooper*, 65 Conn. App. 551, 571, 783 A.2d 100, cert. denied, 258 Conn. 940, 786 A.2d 427 (2001).

In the present case, Tirado, Finn, Soto and Jimenez each knew the defendant prior to August 2, 1996. When questioned by police, each witness said "Nelson" did it, although none knew his last name. They provided the police with a detailed description of the defendant and his vehicle. None of the witnesses could identify the defendant from the hundreds of mug shots with which they initially were presented. In addition, Soto informed the police that the defendant lived with Gonzalez at 65 Malikowski Circle. While investigating 65 Malikowski Circle, a New Britain police officer obtained from Gonzalez a photograph of the defendant. From

this single photograph, the witnesses identified the defendant as the one who committed the murder. The defendant filed a motion to suppress the identification, claiming that the procedure of using a single photograph was unnecessarily suggestive. After reviewing the totality of the circumstances, the court denied the motion to suppress.

Taking all of the circumstances into consideration, we conclude that the identification was reliable. The witnesses testified that Tirado's apartment was well lit and they had a clear view of the incident. In addition, all of the witnesses knew the defendant prior to the incident and gave detailed descriptions of him and his vehicle to the police. Furthermore, one of the witnesses knew exactly where the defendant lived. The identification also occurred only hours after the shooting while the events were still fresh in the minds of the witnesses. Given the totality of the circumstances, irreparable misidentification was not likely.

V

The defendant's final claim is that his intoxication prohibited him from forming the specific intent required for a conviction of murder. To support this claim, the defendant argues that because there was substantial and undisputed evidence that he was intoxicated, the state did not prove beyond a reasonable doubt that he was capable of forming the specific intent to cause the death of the victim, an essential element of the crime. We are not persuaded.

"Our standard of review of sufficiency of evidence claims is well settled. In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have con-

cluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Jackson*, 257 Conn. 198, 204–205, 777 A.2d 591 (2001).

Before a defendant may be found guilty of the crime with which he is charged, the jury must find each element proven beyond a reasonable doubt. See *State* v. *Torres*, 242 Conn. 485, 489–90, 698 A.2d 898 (1997). "The specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Furthermore, [i]ntent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) *State* v. *Young*, 56 Conn. App. 831, 836, 746 A.2d 795, cert. denied, 253 Conn. 904, 753 A.2d 939 (2000).

"[W]hile intoxication is neither a defense nor an affirmative defense to a murder charge in Connecticut, evidence of a defendant's intoxication is relevant to negate specific intent which is an essential element of the crime of murder." (Internal quotation marks omitted.) *State* v. *Austin*, supra, 244 Conn. 239. "Intoxication, however, does not automatically negate intent. . . . It is for the jury to decide, after weighing all the evidence adduced

at trial, whether a criminal defendant's intoxication rendered him incapable of forming the intent required to commit the crime with which he is charged." (Internal quotation marks omitted.) *State* v. *Downey*, 45 Conn. App. 148, 156–57, 694 A.2d 1367, cert. denied, 242 Conn. 909, 697 A.2d 367 (1997).

The defendant argues that the evidence, which is undisputed and strongly supported by all of the state's witnesses, shows that he was intoxicated at the time of the incident. Although there was testimony that the group was drinking and ingesting drugs, there was no testimony regarding the volume. The only evidence that the defendant was impaired at any point during the day was Soto's testimony. Soto testified that the defendant was intoxicated and driving erratically nearly five hours before the shooting.

After construing the evidence in the light most favorable to sustaining the verdict, on the basis of the facts so construed and the inferences drawn therefrom, the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. Whether the defendant was capable of forming the specific intent to commit murder was a question for the jury to decide. Merely asserting that the defendant is intoxicated is not enough to negate the specific intent to commit murder. The defendant left the apartment to retrieve his handgun from his home. He used the handgun in the murder and shot the victim several times at close range. In addition, he fled the scene of the crime. On the basis of the foregoing, the jury reasonably could have concluded beyond a reasonable doubt that the defendant possessed the specific intent to commit murder.

The judgment is affirmed.

In this opinion the other judges concurred.